**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 19, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

In re: STONE PINE INVESTMENT
BANKING, LLC,

    Debtor.

_____

DAVID E. LEWIS, Trustee, as
Chapter 7 Trustee for Stone Pine
Investment Banking, LLC,

    Plaintiff - Appellee/Cross-
    Appellant,

v.

JACK TAKACS; PAUL BAGLEY;
DONALD JACKSON;  HLPEF/SP
MANAGEMENT, LLC; AMERICAN
NATIONAL SECURITY
MANAGEMENT, LP; PRINCETON
PARTNERS,

    Defendants -
    Appellants/Cross-Appellees.

Nos. 21-1423, 21-1431, 21-1439
(D.C. Case No. 20-cv-01372-REB-AP)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **PHILLIPS**, **MURPHY**, and **ROSSMAN**, Circuit Judges.

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, _res judicata_, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

This appeal arises from an adversary proceeding commenced alongside a debtor's filing in bankruptcy court.

The Bankruptcy Code provides an appointed trustee several extraordinary remedies to ensure full and equitable distribution of an estate. Among these remedies is the power to invalidate—or "avoid"—certain transactions predating the bankruptcy petition. 11 U.S.C. § 544. The trustee's avoidance powers are significant but limited by federal law, and substantive state law may control which transactions are voidable.

The Appellants here—several corporate entities and two of their principals—challenge the Trustee's avoidance of several transactions following the Chapter 7 bankruptcy of Stone Pine Investment Banking, LLC, one business in a complex network of related entities. According to Appellants, the transactions could not be avoided under applicable Colorado law and, in any case, the Trustee was time-barred from pursuing avoidance here. On cross-appeal, the Trustee argues the bankruptcy court erred in its denial of additional equitable claims—tolling and veil piercing—and by capping the judgment against the Appellants.

The bankruptcy and district courts considered these arguments and rejected them. So do we. We exercise our jurisdiction under 28 U.S.C. § 158(d)(1) and affirm.

2

# I

This case began nearly thirty years ago. It involves a number of actors, at least four prior judicial proceedings in state and federal court, and various businesses formed, disbanded, or rebranded.

Accordingly, we begin by laying out the lengthy factual background of this proceeding and the transactions at issue. We then discuss the significant, but not unlimited, avoidance powers of the Trustee under federal bankruptcy law. Before turning to the arguments on appeal and cross-appeal, we conclude with a summary of the bankruptcy court's factual findings and legal conclusions.

## A

### 1

In 1994, Appellant Paul Bagley formed Stone Pine Capital, LLC in Denver.[1] Around the same time, Mr. Bagley and his wife also created a general partnership, Appellant Princeton Partners, to be co-owned by the couple. Mr. Bagley conducted various investment banking and asset management activities through the "Stone Pine Companies," a collective of

---

[1] We derive the factual background from the bankruptcy court. We address contested facts, when relevant, in the analysis of the claims on appeal.

businesses using common letterhead, a common office, common business cards, and a common domain name.

In 1997 and 1998, the operations of the Stone Pine Companies were reorganized into three new corporate entities: Stone Pine Investment Banking (SPIB—the debtor here), Stone Pine Asset Management (SPAM), and Stone Pine Administrative Services (SPAS). As successor to the original Stone Pine Capital, SPIB focused on investment banking. SPAM developed private equity management opportunities while working with a separate, non-Stone-Pine company, Hamilton Lane. Eventually, SPAM would become HLPEF/SP Management, a business holding interest in funds created by Hamilton Lane. SPAS was owned by Mr. Bagley's prior acquaintance, Donald Jackson, and provided administrative accounting and recordkeeping services for the various Stone Pine entities.

## 2

In the late 1990s, the Stone Pine Companies engaged Appellant Jack Takacs to work on existing, and develop new, business opportunities. Mr. Takacs's business cards identified him as a Managing Director of the Stone Pine Companies. His history with the Stone Pine Companies—and the nature and extent of his involvement with them—is central to the issues in this proceeding.

4

When Pacific USA Holdings, a business with a preexisting relationship with the Stone Pine Companies, required restructuring, SPIB formed Matisse Capital Partners to provide the necessary services. Matisse operated as a wholly owned subsidiary of SPIB. Mr. Takacs was Matisse's manager, and Mr. Jackson was its chief financial officer. Pacific USA paid Matisse for financial consulting services provided by Mr. Takacs, and Matisse transferred those payments to SPIB.

While working with Pacific USA, Mr. Takacs became a member and part-owner of SPIB. By late 2000, SPIB was owned by Princeton Partners, Mr. Takacs, and Mr. Jackson, with Mr. Bagley as the only manager.

In April 2000, Matisse entered a consulting agreement with American Realty Trust, Inc. (ART). Under the agreement, ART paid Matisse for its consulting services, Mr. Bagley was made ART's chief executive officer and chairman of its board of directors, and Mr. Takacs was appointed a managing director of ART. When ART quickly encountered financial difficulties, Messrs. Bagley and Takacs, apparently without the knowledge of ART's board, negotiated a letter of intent with an investment fund. But this letter of intent precluded forbearance agreements already in process with ART's lenders. The rest of ART's board, on learning of the letter of intent, removed Mr. Bagley from his leadership roles, terminated the consulting agreement, and filed suit.

5

In June 2000, ART sued Matisse and Messrs. Bagley and Takacs in Texas state court. The defendants removed the case to federal district court and filed counterclaims against ART. In 2002, the jury found Matisse, Mr. Bagley, and Mr. Takacs breached their contract with ART and that Matisse and Mr. Bagley breached their fiduciary duties to ART. The jury rejected Matisse's breach-of-contract counterclaim. Nevertheless, the district court entered a judgment notwithstanding the verdict for Matisse and Messrs. Bagley and Takacs. ART was ordered to pay about five million dollars, including prejudgment interest. ART appealed to the United States Court of Appeals for the Fifth Circuit.

In December 2003, the Fifth Circuit affirmed in part and reversed in part. *American Realty Tr., Inc.* v. *Matisse Capital Partners LLC*, 91 F. App'x 904 (5th Cir. 2003). The Fifth Circuit affirmed the district court's conclusion neither Mr. Bagley nor Mr. Takacs could be individually liable for the alleged breach of contract. But it reversed the entry of judgment in favor of Matisse and against ART on the breach-of-contract and breach-of-fiduciary-duty claims. The district court was directed to enter judgment—without damages—for ART on those claims. On remand, the district court awarded attorney's fees to ART in the amount of $1.4 million. *See American Realty Tr., Inc.* v. *Matisse Capital Partners LLC*, No. 3:00-CV-1801-G, 2005 WL 81705 (N.D. Tex. Jan. 13, 2005). ART's attempts to

6

collect that judgment would eventually lead to the bankruptcy filing at issue here.

Less than two weeks after the district court entered judgment for ART, Matisse's bank account was closed. When ART attempted to collect its judgment, post-judgment discovery was returned by the attorney who had represented Matisse in the case. ART sent the same requests to Mr. Jackson—Matisse's registered agent in Colorado—but the correspondence was returned by the post office.

**3**

During the pendency of the Texas federal case, Mr. Takacs had continued to solicit business for Matisse. Mr. Takacs introduced Mr. Bagley to an acquaintance, Riaz Villani, who was interested in acquiring a private equity management firm called Viventures. Mr. Bagley asked Hamilton Lane to assist with Mr. Villani's bid for Viventures. Because Hamilton Lane was chary of the negative press attached to the federal case in Texas, Messrs. Bagley and Jackson resuscitated a dormant Stone Pine entity—HLSP Investment Banking LLC (HLSP IB)—to assist with the bid. HLSP IB and Mr. Villani acquired a membership interest in Private Equity Management Group (PEMG); PEMG then acquired Viventures Partners S.A.

PEMG agreed to a consulting agreement with HLSP IB, Hamilton Lane, and SPAS. Mr. Bagley provided consulting services to PEMG, PEMG paid HLSP IB for these services, and HLSP IB transferred these payments to SPIB. In 2006, however, the parties negotiated an early end to this agreement. By the terms of this early termination, HLSP IB received $1.8 million as a discounted payout on the remainder of the agreement—the PEMG Payout. But instead of transferring these funds to SPIB, as was the prior practice, HLSP IB transferred the $1.8 million to Princeton Partners and Mr. Jackson, based on their ownership interest in HLSP IB (and SPIB).[2] Messrs. Bagley and Jackson then agreed to deposit the funds into SPIB, before the funds were distributed to pay various debts.

**4**

Though Mr. Takacs assigned his forty-percent membership interest in SPIB to Princeton Partners in November 2004, he continued to diligently develop business opportunities for the Stone Pine Companies. We now discuss three of those deals relevant here.

In May 2005, Mr. Takacs signed a letter of intent addressed to a company called TechFund, purporting to act on behalf of an entity called "HLSP Hamilton Lane/Stone Pine." He was apparently referring, in part, to

---

[2] The character of the PEMG Payout is at issue in one of the Trustee's two main fraudulent transfer claims, as we discuss.

HLSP IB, the entity behind the acquisition of Viventures Partners S.A. as part of the PEMG deal.

After having developed a relationship with executives at a large Japanese investment firm called Nomura International PLC, Mr. Takacs discussed with them their purchase of a leveraged PE fund, to be managed by a Stone Pine entity. In June 2005, Messrs. Bagley and Takacs signed a letter of agreement with Nomura on behalf of "HLSP Stone Pine Investment Banking LLC." The Nomura Agreement, sent to Messrs. Bagley and Takacs at the Stone Pine entities' common address, identified "HLSP Stone Pine Investment Banking LLC" as "a joint venture between Hamilton Lane Advisers and Stone Pine Companies." RVIII.22-23.

And Mr. Takacs also worked with Moneda Asset Management, S.A., a Chilean private equity and asset management firm, to establish a "fund of funds" targeting Chilean pension fund investors. Moneda's draft letter of intent, initialed but unsigned by Mr. Takacs, was directed to Mr. Takacs as president of "HLSP Holdings Corp," a renamed entity created out of a Puerto Rican corporation previously formed by one of the Stone Pine Companies' attorneys. RVIII.24-25.

While in Chile for a separate deal, Mr. Takacs began working with Rene Mueller, CEO of Fortune Management, Inc. Fortune was interested in raising funds to acquire other wealth management companies. Mr. Takacs

spoke with Mr. Bagley about the deal in the spring of 2005. In May 2005, Mr. Mueller sent Messrs. Bagley and Takacs a letter of intent and draft press release regarding Fortune's proposed acquisition of "100% of the shares of Hamilton Lane/Stone Pine Investment Banking HLSP . . . a joint venture between the Stone Pine Companies . . . and Hamilton Lane." RVIII.21. The draft letter of intent claimed HLSP had a pipeline of deals representing anticipated income of $10-15 million/year. The deal pipeline ultimately transferred to Fortune included the TechFund, Nomura, and Moneda transactions.

**5**

In June 2005, Mr. Bagley met with Hamilton Lane representatives about the Fortune deal. The Fortune, Nomura, Moneda, and TechFund deals all anticipated Hamilton Lane involvement, including, in the case of the Fortune transaction, transferring Hamilton Lane stock to Fortune.

Hamilton Lane's anticipated involvement with these transactions was, however, news to Hamilton Lane. Hamilton Lane CEO Mario Giannini asked Mr. Bagley why Hamilton Lane's name was being used and why Hamilton Lane was identified as a participant in a joint venture (HLSP IB) it was not part of. Mr. Bagley claimed this was Mr. Takacs's error and tried to convince Hamilton Lane to participate in the deals. Hamilton Lane's shares were withdrawn from the Fortune transaction, but Hamilton Lane

would eventually participate in some of the deals, including the Nomura transaction.

On July 1, 2005, Messrs. Bagley and Takacs entered into consulting and employment agreements, respectively, with Fortune. Within the week, the Fortune deal was finalized. As part of the deal, HLSP Holdings transferred almost all its assets to a new Fortune subsidiary, Fortune Transfer Corp., in exchange for Fortune common stock. This common stock would be liquidated and distributed to HLSP's shareholders in exchange for HLSP shares. Among the assets HLSP Holdings transferred were its "Private Equity Assets," meaning "the pending and potential transactions listed in Exhibit A"—the Nomura, Moneda, and TechFund deals. RVIII.26. The Fortune deal agreement "required Bagley and Takacs to close each of the transactions identified . . . and to 'forward and refer all future private equity business opportunities to Fortune and, as the case may be, use . . . reasonable best efforts to pursue such opportunities on behalf of Fortune.'" *Id.*[3]

---

[3] Whether the transfer of these transactions was fraudulent under federal and state law forms the basis of the Trustee's other fraudulent transfer claim, alongside the PEMG Payout.

In exchange for 33,584,600 shares of Fortune stock worth $37.3 million, Fortune acquired HLSP Holdings' private equity business.[4] Mr. Bagley became the new chairman of Fortune's board, Mr. Takacs became its new president, and Hermann Seiler (who had worked with Mr. Takacs in Chile) became the new COO.

SPIB paid about $5500 in expenses related to the Fortune deal, including $3000 to Mr. Leonard and $1500 to a Puerto Rican law firm. In an email during the accounting process, Mr. Bagley explained SPIB would pay the expenses as "SPIB controls HLSP and the shares are allocated to [Mr. Jackson], [Mr. Takacs] and I." RVIII.28.

**6**

Given the failure of its attempts to collect on the federal judgment, ART sued Messrs. Bagley and Takacs, Matisse, Stone Pine Capital, Stone Pine Financial, and SPIB in Texas state court in July 2006. ART asserted claims based on fraudulent transfers, common business enterprise and conspiracy, and constructive trust. ART also sought enforcement of discovery orders, turnover, and its attorney's fees. The Texas Secretary of

---

[4] The vast majority of these shares were distributed to Mr. Takacs (~12.3 million), Mr. Seiler (~8 million), Mr. Bagley (~7.4 million), and Mr. Jackson (~5 million). The remaining shares were given to two attorneys who represented Messrs. Bagley and Takacs in the Texas federal case and to a Puerto Rican law firm.

State attempted to serve Matisse with the complaint at the Stone Pine Companies' common address, but the correspondence was returned as undeliverable.

The Texas state court limited ART's fraudulent transfer claims. Only those transactions between September 16, 2002—the date of the federal district court's entry of judgment notwithstanding the verdict—and January 6, 2005—the date Matisse closed it bank accounts—could proceed. ART moved for reconsideration of these restrictions, but the motion was denied. The Texas state court also granted partial summary judgment in favor of the defendants as to ART's alter ego claims and as to ART's fraudulent transfer claims against Stone Pine Capital, Stone Pine Financial, and Mr. Takacs.

In July 2009, the jury found for ART on the remaining claims. The jury determined SPIB was the alter ego of Matisse, but it did not reach the fraudulent transfer issue or the questions of Mr. Bagley's and Mr. Takacs's liability for SPIB's conduct. The Texas state court conditioned resolution of those issues on a negative response to the question of whether SPIB was Matisse's alter ego. Because the jury found SPIB *was* Matisse's alter ego, it could not decide the issues of fraudulent transfer or liability for SPIB's conduct. The Texas state court entered judgment on November 11, 2009, for

13

ART and against SPIB, in the amount of the federal judgment plus interest—around $1.4 million.

SPIB appealed the verdict and ART appealed the pre-trial claim restrictions and the jury charge which prevented the jury from reaching the issue of fraudulent transfers. Those appeals were pending when SPIB filed for bankruptcy.

**7**

Within days of the entry of judgment in the Texas state case, Mr. Bagley began speaking with Colorado bankruptcy counsel. Messrs. Bagley and Jackson decided to hold off on an immediate bankruptcy filing after determining that would "let [ART] start over with fraudulent transfer claims out of SPIB." RVIII.35. Instead, they decided they would try to "get as much mileage as possible out of the [Texas state] appeal and as a result . . . hold off on the bankruptcy." *Id.*

In May of 2010, Messrs. Bagley and Jackson closed SPIB's bank accounts. In June, they wrote to their bankruptcy counsel to explain "[t]he reason for [their] delay" was "the four year clock has run on several transactions as the appeal process runs." RXXXII.121.[5]

---

[5] As we explain, the Bankruptcy Code allows an appointed trustee to void some prior transfers for the benefit of a debtor's estate. Those powers, however, come with certain restrictions, including a limitations period on voidable transactions. *See* 11 U.S.C. §§ 544–553.

SPIB eventually filed its Chapter 7 bankruptcy case in October 2010. David Lewis was appointed as Chapter 7 Trustee.

Two years later, and pursuant to his avoidance powers under the Code, the Trustee initiated this adversary proceeding against Messrs. Bagley, Takacs, and Jackson and eighteen corporate entities. The Trustee brought claims to recover fraudulent transfers under 11 U.S.C. §§ 544 and 548 and Colorado law; the Trustee also alleged breach of fiduciary duty and brought a claim for alter ego-veil piercing.

By the end of trial in May 2018, the Trustee had claims remaining against the following defendants: Messrs. Bagley, Takacs, and Jackson; HLSP Investment Banking, HLPEF/SP Management, Princeton Partners, and American National Security Management.[6]

---

[6] The bankruptcy court dismissed the Trustee's claims against eight defendants in June 2016.

In September 2017, the bankruptcy court granted partial summary judgment to Mr. Takacs "to the extent Trustee sought to avoid under § 548 any transfers that took place more than two years prior to Debtor's petition date" and granted summary judgment as to all remaining Defendants "to the extent Trustee sought to avoid under § 548 any transfers that took place more than two years prior to Debtor's petition date." RVIII.37.

At conclusion of evidence, the Trustee entered into a settlement with Defendant SPAS. RVII.37.

**B**

To understand the Trustee's claims, the Appellants' defenses, and the arguments on appeal, we briefly discuss the federal and state law applicable here.

"The commencement of a bankruptcy case 'creates an estate.'" *Cohen* v. *Chernushin* (*In re Chernushin*), 911 F.3d 1265, 1269 (10th Cir. 2018) (quoting 11 U.S.C. § 541(a)). The property of that estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1); *see Begier* v. *I.R.S.*, 496 U.S. 53, 59 n.3 (1990) (explaining the debtor's "property" is "coextensive with 'interests of the debtor in property.'" (quoting 11 U.S.C. § 541(a)(1))). Those property interests are "created and defined by state law." *Butner* v. *United States*, 440 U.S. 48, 55 (1979).

To "recaptur[e] the value" of certain pre-petition transactions, the Bankruptcy Code "affords bankruptcy trustees the authority" to "avoid[] transfers for the benefit of the estate." *Merit Mgmt. Grp., LP* v. *FTI Consulting, Inc.*, 138 S. Ct. 883, 888 (2018) (first alteration in original) (citation omitted); *see also* 11 U.S.C. § 550(a) ("[T]o the extent that a transfer is avoided . . . the trustee may recover, for the benefit of the estate, the property transferred . . . ."). The trustee's avoidance powers enable the trustee "[t]o maximize the funds available for, and ensure equity in, the

16

distribution [of the estate] to creditors in a bankruptcy proceeding." *Merit Mgmt.*, 138 S. Ct. at 887-88.

**1**

These powers, and the limitations on their exercise, are codified in Sections 544 to 553 of the Bankruptcy Code. One of those provisions, 11 U.S.C. § 548, permits a trustee to avoid fraudulent transfers or obligations. However, the transfers sought to be avoided must have been "made or incurred on or within 2 years before the date of the filing of the petition." 11 U.S.C. § 548(a)(1). When the target transfers occurred *outside* this two-year period, a trustee may still rely on powers granted in another section, 11 U.S.C. § 544. Section 544 empowers a bankruptcy trustee to invalidate prior transfers if those transfers could be avoided by either of two types of creditors. *Hamilton* v. *Wash. Mut. Bank FA* (*In re Colon*), 563 F.3d 1171, 1174 (10th Cir. 2009). Wielding this power, a trustee may avoid transactions as a *hypothetical* creditor under § 544(a) or as an *actual*, *unsecured* creditor under § 544(b).

In relevant part, 11 U.S.C. § 544(a) provides: "The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor

17

that is voidable by" "a creditor that extends credit to the debtor at the time of the commencement of the case . . . whether or not such a creditor exists."

We have explained § 544(a) "confers on a trustee . . . the same rights that an ideal hypothetical lien claimant without notice possesses as of the date the bankruptcy petition is filed." *Morris* v. *CIT Grp./Equip. Fin., Inc.* (*In re Charles*), 323 F.3d 841, 842 (10th Cir. 2003) (quoting *Pearson* v. *Salina Coffee House, Inc.*, 831 F.2d 1531, 1532 (10th Cir. 1987)). Exercising his powers under this "strong arm" provision, the trustee can "avoid any unperfected liens on property belonging to the bankruptcy estate," *Pearson*, 831 F.2d at 1532, proceeding as if he were a "hypothetical ideal creditor[]," *Sender* v. *Simon*, 84 F.3d 1299, 1304 (10th Cir. 1996).

When a trustee proceeds under 11 U.S.C. § 544(b), he "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law."

Put differently, § 544(b) "empowers a trustee to step into the shoes, so to speak, of an actual creditor with an unsecured claim and invoke the state law applicable to the transfer the trustee seeks to avoid." *Miller* v. *United States*, 71 F.4th 1247, 1250 (10th Cir. 2023). Because § 544(b) requires an "actual creditor," a bankruptcy trustee must first show there is, in fact, an existing creditor "holding an allowable unsecured claim . . . who, under [state] law, could avoid the transfers in question." *Sender*, 84 F.3d

18

at 1304 (quoting *Dicello* v. *Jenkins* (*In re International Loan Network, Inc.*), 160 B.R. 1, 18 (Bankr. D.D.C. 1993)).

A trustee's powers under § 544(a) and § 544(b) differ in at least two significant respects. First, § 544(b) avoidance requires an actual creditor; § 544(a) avoidance does not. Second, § 544(a) avoidance empowers the trustee with the rights of a lien creditor when the bankruptcy petition is filed; § 544(b) grants the trustee rights which preexist the date of the petition. 11 U.S.C. § 544(a), (b); *see generally* David Gray Carlson, *The Trustee's Strong Arm Power Under the Bankruptcy Code*, 43 S. C. L. Rev. 841, 850 (1992).

**2**

To determine the "rights and powers" of a § 544(a) hypothetical creditor and a transaction's "voidab[ility] under applicable law" under § 544(b), a trustee may rely on substantive, non-bankruptcy law. *See* 5 *Collier on Bankruptcy* ¶ 544.02(1) (16th ed. 2023) ("The strong arm rights and powers are conferred on the trustee by federal law. However, the extent of the trustee's rights . . . [is] measured by the substantive nonbankruptcy law of the jurisdiction governing the property or cause of action in question."). Generally, the "status and rights of" a § 544 creditor "are determined by state law." *In re Colon*, 563 F.3d at 1174; s*ee also McCannon* v. *Marston*, 679 F.2d 13, 14 (3d Cir. 1982) (explaining § 544 "grants the

trustee the state law defined rights and powers of certain creditors and transferees of property."). Substantive state law also determines the limitations attached to a trustee's claims. For example, a trustee proceeding under § 544(b)(1) has "no greater rights of avoidance than the actual creditor would have . . . [I]f the creditor . . . is barred from recovery because of the running of a statute of limitations prior to the commencement of the case, the trustee is likewise . . . barred." 5 *Collier on Bankruptcy* ¶ 544.06(3).

Here, the substantive state law is the Colorado Uniform Fraudulent Transfer Act, Colo. Rev. Stat. §§ 38-8-101 *et seq.* (CUFTA). As relevant here, CUFTA provides a "transfer made or obligation incurred by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer or incurred the obligation" "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." Colo. Rev. Stat. § 38-8-105(1)(a).[7] Under this section, it matters not "whether the creditor's claim arose before or after the transfer was made or the obligation was incurred." Colo. Rev. Stat. § 38-8-105(1).

But CUFTA comes with its own limitations. The statute requires fraudulent transfer claims under § 38-8-105(1)(a) be brought "within four

---

[7] This language is nearly identical to that in the Bankruptcy Code, which itself draws on the Tudor-era Statute of Elizabeth. *Compare* 11 U.S.C. § 548(a)(1)(A) ("made . . . with actual intent to hinder, delay, or defraud any entity. . .") *with* 13 Eliz., ch. 5 (1571) ("intent to hinder, delay or defraud creditors and others").

years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant." Colo. Rev. Stat. § 38-8-110(1)(a).

### C

Having laid out the law under which the Trustee brought his claims, we arrive at the adversary proceeding itself. In April 2020, the bankruptcy court issued thorough findings of fact and conclusions of law. We briefly summarize that decision.

Before considering whether any specific transactions were fraudulent, the bankruptcy court first determined the Fortune transfers (the transfer of the Nomura, Moneda, and Techfund deals to HLSP Holdings and then to Fortune in July 2005) and the PEMG payout (the transfers of funds received from the PEMG payout in May and September 2006) concerned property of SPIB. PEMG, the district court explained, was a "Takacs-initiated private equity asset management opportunity . . . consummated through a SPIB-owned entity, HLSP IB." RVIII.39. SPIB "had a sufficient interest in the funds included in the PEMG payout that the transfers of the funds from HLSP IB to Princeton Partners and to Jackson should be considered transfers of SPIB funds." *Id.* The Fortune Opportunities, too, were "Takacs-initiated private equity asset management opportunities." *Id.* The bankruptcy court rejected the Appellants' portrayal of Mr. Takacs as a "lone

wolf, acting on his own to develop those opportunities." *Id.* Rather, the bankruptcy court explained, Mr. Takacs, "as part of his work as a Managing Director of the Stone Pine Companies, using a Stone Pine mailing and email address . . . identified business opportunities and presented them to Bagley so those opportunities could be realized, ideally with the help of Hamilton Lane." *Id.*

Having identified the transactions to which the Trustee's requested relief might apply, the bankruptcy court turned to the applicable fraudulent transfer provisions in Colorado law. The Trustee brought claims under three sections of CUFTA—Colo. Rev. Stat. §§ 38-8-105(1)(a) (transfers made with fraudulent intent); 38-8-105(1)(b) (transfers made for less than reasonably equivalent value); and 38-8-106(2) (transfers made to insiders while the debtor was insolvent)—which the bankruptcy court examined sequentially.

In assessing the fraudulent intent claim, the bankruptcy court went through each of the eleven factors in Colo. Rev. Stat. § 38-8-105(2)(a)-(k), and held "the evidence requires a conclusion Bagley, Takacs, and Jackson acted with fraudulent intent required for liability under" the statute. RVIII.44. Based on this finding, the bankruptcy court concluded it did not need to reach the other grounds of liability in Colo. Rev. Stat. §§ 38-8-105(1)(b) and 38-8-106(2).

Still, the bankruptcy court had to consider the issue of timeliness, and it turned to CUFTA's statute of limitations, Colo. Rev. Stat. § 38-8-110. The statute provides for tolling in cases of transfers made with fraudulent intent (Colo. Rev. Stat. § 38-8-105(1)(a)) but not transfers under Colo. Rev. Stat. §§ 38-8-105(1)(b) or 38-8-106(2). The bankruptcy court concluded, therefore, that the latter two causes of action expired pre-petition.

That left the § 38-8-105(1)(a) claim. The extent of the tolling available under this claim, the bankruptcy court explained, depended on whether the Trustee was "proceeding under 11 U.S.C. § 544(a), with the powers of a hypothetical creditor, or 11 U.S.C. § 544(b), as an actual, unsecured creditor in Debtor's bankruptcy case." RVIII.46. Because the Trustee here was proceeding under both, the court discussed both.

The bankruptcy court accepted the Trustee's contention the statute starts to run when the hypothetical creditor extends credit—at the beginning of the case—and found the Trustee's fraudulent transfer claims were timely filed under 11 U.S.C. § 544(a). Even if this were not the case, the bankruptcy court explained the "Court would nevertheless find equitable tolling applicable" for claims brought through the Trustee's § 544(a) powers. RVIII.47.

The Appellants argued the Fortune press release was "sufficient to put a reasonable creditor on notice of the transactions." RVIII.47. Not so,

said the bankruptcy court. "In order to provide notice that starts the statute of limitations, the notice must reveal *the fraudulent nature* of the transaction," not just the transaction itself. *Id.* (emphasis added).

The bankruptcy court also found the Trustee's fraudulent transfer claims timely filed under 11 U.S.C. § 544(b). It did so, however, only under the doctrine of equitable tolling. The bankruptcy court explained the Texas state court had "limited ART's fraudulent transfer claims to those occurring between September 16, 2002 and January 6, 2005, and also limited the jury's ability to find a fraudulent transfer. . . . Because the jury found Matisse to be the alter ego of SPIB, the jury did not decide whether fraudulent transfers were made." RVIII.48. ART preserved its right to assert those issues by appealing the rulings and "actively pursued judicial remedies *within* the period of limitations." RVIII.49 (emphasis added).

Having found the transactions fraudulent under Colo. Rev. Stat. § 38-8-105(1)(a) and the Trustee's claims timely under 11 U.S.C. § 544, the bankruptcy court turned to its 11 U.S.C. § 550 analysis.

As to the Fortune Opportunities, the bankruptcy court held Messrs. Takacs, Bagley, and Jackson and Princeton Partners were liable to the estate for the value of Fortune stock each received. As to the PEMG Payout, Messrs. Bagley and Jackson and Princeton Partners were liable to the Trustee for the difference in the $1.8 million PEMG paid HLSP IB that

24

*should* have been transferred to SPIB but was instead allocated among Messrs. Bagley and Jackson and Princeton Partners. In conclusion, the bankruptcy court found:

> [The] Trustee has proven intentional fraudulent transfers, avoidable under Colo. Rev. Stat. § 38-8-105(1)(a), as a representative of creditors under either 11 U.S.C. § 544(a) or § 544(b), with a complaint timely filed under 11 U.S.C. § 546. Under 11 U.S.C. § 550, Trustee is entitled to recover the following amounts: (1) from Takacs, the amount of $6,833,856.53, for the value of the Fortune stock; (2) from Bagley, the amount of $4,770,302.42, for the value of the Fortune stock ($4,100,313.92), the PEMG Payout ($286,400.00) and the Identified Transactions ($383,587.50); (3) from Jackson, the amount of $2,805,142.61, for the value of the Fortune stock ($2,733.542.61), and the PEMG Payout ($36,000 and $35,600.00); (4) from Princeton Partners, the amount of $4,386,713.92, for the value of the Fortune stock ($4,100,313.92) and the PEMG Payout ($286,400.00); (5) from HLPEF/SP Management, the amount of $80,737.00 for the Identified Transactions; and (6) from ANSM, the amount of $90,000, for the Identified Transactions.

RVIII.51.

The bankruptcy court sided against the Trustee on the claims for breach of fiduciary duty, finding (1) all members of SPIB were informed of all material facts and authorized or ratified the Fortune transaction, barring the Trustee's claims for breach of fiduciary duty under Colo. Rev. Stat. § 7-80-404(1)(a)-(b); (2) the claim for breach relating to Mr. Bagley's entrance into the Fortune deal and his accompanying employment agreement was subject to a three-year statute of limitations which expired

25

pre-petition, Colo. Rev. Stat. § 13-80-101(1)(f); and (3) equitable tolling was unavailable, because it was unavailable to the debtor, SPIB, and the Trustee's standing for the breach claim relied on his standing as "representative" of a debtor under 11 U.S.C. § 541.

Finally, the bankruptcy court reached the Trustee's alter ego claims. The bankruptcy court determined the Trustee had standing to assert these claims as a representative of creditors under 11 U.S.C. § 544. The bankruptcy court separately considered whether "Defendants that are Stone Pine entities are alter egos of each other or of Debtor" and "whether the corporate veil should be pierced to hold Takacs, Bagley, and Jackson individually liable for the Stone Pine entities' debts." RVIII.54. It denied the Trustee both forms of relief.

*First*, the bankruptcy court concluded HLSP IB, HLPEF/SP Management, and ANSM were not alter egos of each other or of SPIB. "[E]ach of the three Stone Pine entity Defendants was operated as a distinct business entity, with the three different Defendants involved in separate business deals, having separate income streams, and separate investors." RVIII.55.

*Second*, the bankruptcy court held the corporate veil should not be pierced. "While the Court finds Bagley, Takacs, and Jackson participated in a scheme to transfer Debtor's assets to other entities and to themselves,

26

those transfers do not rise to the level of ignoring the corporate existence of each entity. Although it is a close call, the Court finds the relevant factors insufficient to support a conclusion Debtor was the alter ego of the individual Defendants." RVIII.56.

On April 28, 2020, the bankruptcy court granted Defendants' motion to alter or amend the judgment under Fed. R. Bankr. P. 9023, limiting the "Trustee's recovery . . . to the amount necessary to pay all claims, administrative claims, and statutory Trustee fees in full." RVIII.67.

Appellants and the Trustee appealed to the district court. After consolidating the appeals and cross-appeals, the district court affirmed the bankruptcy court's judgment in its entirety. Appellants and the Trustee timely appealed that decision to this court.

## II

We review the bankruptcy court's decision under the same standard of review as the district court. *Conoco, Inc.* v. *Styler* (*In re Peterson Distrib., Inc.*), 82 F.3d 956, 959 (10th Cir. 1996). We assess *de novo* the bankruptcy court's legal conclusions and review its factual findings for clear error. *In re Chernushin*, 911 F.3d at 1269. A finding is clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson* v. *City of Bessemer*, 470 U.S. 564, 573 (1985) (quoting *United States* v. *U.S. Gypsum*

27

*Co.*, 333 U.S. 364, 395 (1948)). Applying this standard, we have explained a bankruptcy court's factual findings "should not be disturbed absent 'the most cogent reason appearing in the record.'" *Travelers Ins. Co.* v. *Pikes Peak Water Co.* (*In re Pikes Peak Water Co.*), 779 F.2d 1456, 1458 (10th Cir. 1985) (quoting *First Bank of Catoosa* v. *Reid* (*In re Reid*), 757 F.2d 230, 233–34 (10th Cir. 1985)).

We review the applicability of equitable doctrines like tolling for an abuse of discretion. *Braxton* v. *Zavaras*, 614 F.3d 1156, 1159 (10th Cir. 2010); *cf. Holmes* v. *Spencer*, 685 F.3d 51, 62 (1st Cir. 2012) ("We review a . . . decision to deny equitable tolling for abuse of discretion. Abuse of discretion is not a monolithic standard of review; within it, abstract questions of law are reviewed *de novo*, findings of raw fact are reviewed for clear error, and judgment calls receive a classically deferential reception.").

"Although we may look to the district court's intermediate appellate analysis to inform our review, we owe no deference to that court's decision." *Search Mkt. Direct, Inc.* v. *Jubber* (*In re Paige*), 685 F.3d 1160, 1178 (10th Cir. 2012).

## III

Mr. Takacs and the Bagley Appellants[8] advance several arguments on appeal to support reversal. They claim the Trustee's fraudulent transfer claim related to the Fortune Opportunities was time-barred. And even if timely, the Fortune Opportunities were neither *property* nor *property belonging to SPIB*, as needed to trigger voidability under CUFTA.

Separately and additionally, the Bagley Appellants claim reversal is required because (1) Princeton Partners never received any Fortune stock, (2) the PEMG Payout was not a fraudulent transfer, and (3) the fraudulent transfer claim related to the PEMG Payout was untimely.

We address each argument in turn. As we explain, we discern no basis to disturb the bankruptcy court's judgment.

## A

According to Mr. Takacs and the Bagley Appellants, the Trustee's fraudulent transfer claims related to the Fortune Opportunities were time-barred. We disagree.

Recall, fraudulent transfer claims brought under Colo. Rev. Stat. § 38-8-105(1)(a) are considered "extinguished" unless an action is brought "within four years after the transfer was made or the obligation was

---

[8] We use the term "Bagley Appellants" to refer to Appellants Mr. Bagley, HLPEF/SP Management, Princeton Partners, and ANSM.

incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant." Colo. Rev. Stat. § 38-8-110(1)(a). Because § 38-8-110 is a statute of limitations,[9] equitable tolling is presumptively available. *United States* v. *Kwai Fun Wong*, 575 U.S. 402, 407 (2015).

When the Trustee proceeds under § 544(a), he has the rights and powers of a hypothetical creditor. The bankruptcy court found "a hypothetical creditor could not have discovered the fraudulent transfers prior to the bankruptcy filing because they were concealed, and the Defendants participated in a wrongful scheme to evade discovery obligations, delay the Texas state court appeal, and delay the bankruptcy filing for the specific purpose of avoiding the statute of limitations."

---

[9] On appeal, the Bagley Appellants argue Colo. Rev. Stat. § 38-8-110(1)(a) is a statute of *repose*, not *limitations*, and therefore "not subject to equitable tolling." Bagley Br. at 20.

But the Bagley Appellants never made this argument before the district court. Although they generally referred to a "statutory limitations/repose period" in their district court briefing, *see, e.g.*, Supp.RXIII.53, the Bagley Appellants did not argue specifically that § 38-8-110 was a statute of repose and thus not subject to tolling as a matter of law. Nor did the district court pass on the issue. We therefore consider this argument waived and decline to address it. *See Kellogg* v. *Watts Guerra LLP*, 41 F.4th 1246, 1262 (10th Cir. 2022); *Carpenter* v. *Williams* (*In re Carpenter*), 205 F.3d 1249, 1253 (10th Cir. 2000).

30

RVIII.47. Based on that finding, the bankruptcy court deemed equitable tolling appropriate.

We discern no abuse of discretion in this conclusion. Indeed, the Colorado Supreme Court has held equitable tolling proper when a "defendant's wrongful conduct prevented the plaintiff from asserting his or her claims in a timely manner." *Dean Witter Reynolds, Inc.* v. *Hartman*, 911 P.2d 1094, 1096 (Colo. 1996). We endorsed that principle in *Chasteen* v. *UNISIA JECS Corp.*, 216 F.3d 1212, 1220 (10th Cir. 2000), and do so again today. *See id.* ("The principle underlying equitable tolling . . . is that a person should not be permitted to benefit from *his or her own* wrongdoing . . . ." (alteration omitted) (quoting *Hartman*, 911 P.2d at 1096-97)).

The factual record developed before the bankruptcy court evinces many examples of the Appellants' obstruction. For example, Messrs. Bagley and Jackson discussed delaying the bankruptcy filing with the express purpose of "get[ting] as much mileage as possible out of the [state court] appeal" to prevent ART from asserting "fraudulent transfer claims out of SPIB." RVIII.35. "The reason for our delay," Mr. Bagley explained, "is that the four year clock has run on several transactions as the appeal process runs." RVIII.36. When ART requested discovery-related documents, Messrs. Bagley and Jackson refused to turn them over. *Id.*

31

Based on Appellants' conduct, we agree with the bankruptcy court that § 544(a)'s hypothetical creditor could not have discovered the fraudulent transfers before SPIB's bankruptcy filing, and equitable tolling is therefore appropriate.

In the alternative, if the Trustee proceeds under § 544(b), he has the rights and powers of the actual, unsecured creditor in whose shoes he stands—here, that is ART. According to the bankruptcy court, ART diligently pursued its claims in Texas state court. The bankruptcy court determined ART was only barred from recovery because the Texas trial court prevented the jury from reaching the issue of fraudulent transfers if it found Matisse to be the alter ego of SPIB (which it did). ART "did not sleep on its rights" and "pursued the Defendants to the fullest extent it could." RVIII.49. Accordingly, the Trustee, stepping into the shoes of ART, was prevented—as a matter of law—from pursuing his claims as an actual, unsecured creditor but preserved his rights to do so.

We find no abuse of discretion in the bankruptcy court's application of tolling under § 544(b). ART preserved its objection to the Texas trial court's restraints on the jury's findings and advanced these claims when able. "It actively pursued judicial remedies *within* the period of limitations," RVIII.49 (emphasis added), and we impute to the Trustee this same diligence.

32

**B**

Next, Mr. Takacs and the Bagley Appellants claim the Fortune Opportunities were not *property* under CUFTA. Application of CUFTA's fraudulent transfer provisions requires a predicate transfer of property. If the Fortune Opportunities were not property, Appellants reason, there can be no claim for a transfer at all, never mind a fraudulent one.[10] *See* Takacs Br. at 55 (citing 11 U.S.C. § 544(b); Colo. Rev. Stat. §§ 38-8-105; 38-8-106).

Because "[p]roperty interests are created and defined by state law," *Butner*, 440 U.S. at 55, we begin our review by examining the relevant state statutory text. Here, that principle directs us to the definition of "property" in CUFTA.

CUFTA defines "Property" as "anything that may be the subject of ownership." Colo. Rev. Stat. § 38-8-102(11); *Lewis* v. *Taylor*, 427 P.3d 796, 799 (Colo. 2018). CUFTA does not define "ownership," but the plain legal meaning of ownership is "the bundle of rights allowing one to use, manage, and enjoy property, including the right to convey it to others." *Ownership,*

---

[10] As an initial matter, the parties disagree on the applicable standard of review for this question. The Trustee claims "[w]hether the Fortune [Opportunities] constitute CUFTA property concerns fact issues reviewed for clear error." Trustee Br. at 34. Mr. Takacs argues this issue "is one of law that this Court reviews *de novo*." Takacs Br. at 55 n.140. We need not decide the issue here because even applying *de novo* review, we would find the Fortune Opportunities "property" under CUFTA.

Black's Law Dictionary (11th ed. 2019); *see also id.* ("Ownership implies the right to possess a thing, regardless of any actual or constructive control.").

According to the Trustee, CUFTA's provisions are "broadly written, seemingly to encompass a variety of novel and creative means by which debtors attempt to hinder, delay, or defraud creditors." Trustee Br. at 34. On its face, CUFTA's definition of property is expansive. The statute's official comment accords with the plain text: "Property includes both real and personal property, whether tangible or intangible, and any interest in property, whether legal or equitable." Colo. Rev. Stat. § 38-8-102 cmt. (10).

Under these circumstances, we find persuasive the Trustee's contention "[t]he business opportunities or pipeline deals transferred were property" for which "Fortune paid HLSP millions of dollars of Fortune stock." Trustee Br. at 36. The record shows Mr. Bagley and Mr. Takacs transferred SPIB-developed Nomura, TechFund, and Moneda opportunities to Fortune and further agreed to develop these and other pipeline deals exclusively for and through Fortune. The press release issued by Fortune on July 8, 2005, described the purchase of "private equity transactions in differing stages of negotiation." RVIII.27. That these Opportunities served as consideration for Fortune stock—apparently the *only* consideration—and were transferred for millions of Fortune shares supports an understanding of the Fortune Opportunities as property under CUFTA. When Fortune

34

"acquire[d] the private equity business" of HLSP Holdings, what it purchased were the Fortune Opportunities. *Id.*

Our conclusion is reinforced by the Colorado Supreme Court's decision in *SDI, Inc.* v. *Pivotal Parker Com., LLC*, 339 P.3d 672 (2014), which considered a statutory provision authorizing special districts in Colorado to "acquire, dispose of, and encumber real and personal property." Colo. Rev. Stat. § 32-1-1001(1)(f).[11] Writing for a unanimous court, then-Justice Eid rejected the respondent's argument that the "right to receive revenue in the future" did not fall within the terms of the statute. *Pivotal Parker*, 339 P.3d at 676–77. Rather, the court explained, "property" is "a broad term used to describe 'whatever is the subject of legal ownership,' including 'physical things . . .' and '*intangible things*, such as franchise, patent rights, copyrights, trade-marks, trade-names, business good will, rights of action, etc.'" *Id.* (quoting *Las Animas Cnty. High Sch. Dist.* v. *Raye*, 356 P.2d 237, 239 (1960)). We find that holding instructive here.

Based on the plain language of the statute—and reassured by a capacious judicial understanding of that language in analogous

---

[11] *Pivotal Parker* involved Colorado's Special District Act, Colo. Rev. Stat. § 32-1-101 *et seq.*, not CUFTA. But the court's analysis was not limited to that statutory scheme and its reasoning borrowed from precedents on plain meaning and analogous statutes. *See Pivotal Parker*, 339 P.3d at 676–77.

circumstances—we conclude the Fortune Opportunities were property under CUFTA.

## C

Mr. Takacs and the Bagley Appellants next contend that even assuming the Fortune Opportunities *are property* under CUFTA, they were not *SPIB's property*. The bankruptcy court's conclusion the Fortune Opportunities were SPIB's property is a factual determination we review for clear error. *See Sunshine Heifers, LLC* v. *Citizens First Bank* (*In re Purdy*), 870 F.3d 436, 444–45 (6th Cir. 2017) (reviewing bankruptcy court's "factual findings on ownership" for clear error); *cf. United States* v. *Maez*, 915 F.2d 1466, 1468 (10th Cir. 1990) ("We will uphold the district court's determination of ownership, unless clearly erroneous."). We find none.

Fraudulent transfer claims under CUFTA are equitable in nature. *Morris* v. *Askeland Enters., Inc.*, 17 P.3d 830, 832-33 (Colo. App. 2000). And, under Colorado law, "[e]quity . . . has to do with the substance and reality of a transaction—not the form and appearance which it may be made to assume." *Rocky Mountain Gold Mine* v. *Gold, Silver & Tungsten, Inc.*, 93 P.2d 973, 982 (Colo. 1939); *see also Wilson* v. *Goldman*, 699 P.2d 420, 426

(Colo. App. 1985) (explaining equity looks to the substance of a transaction, not its form).[12]

The bankruptcy court correctly explained "SPIB paid development expenses" for the Fortune Opportunities. RVIII.40. The record confirms SPIB paid expenses, too, for the Fortune transaction transferring these Opportunities. The bankruptcy court found Mr. Takacs cultivated the deals while working as a "Managing Director" of the "Stone Pine Companies." RVIII.39-40. Fortune's correspondence regarding the transaction and Opportunities was addressed to "The Stone Pine Investment Banking L.L.C." at the address SPIB shared with other Stone Pine entities. RXVII.120–21. So, while it may have been HLSP Holdings that officially transferred the Opportunities, we can discern no error, much less a clear one, in the bankruptcy court's determination the Fortune Opportunities were SPIB's property.

## D

The Bagley Appellants challenge the bankruptcy court's judgment against Princeton Partners, contending it was based on an erroneous factual finding "that transfers to Bagley were essentially also transfers to

---

[12] The Bagley Appellants resist these precedents, describing the bankruptcy court's application of the substance-and-reality test as an "equitable panacea." Bagley Br. at 51. We reject this characterization, and apply the test as Colorado requires.

Princeton Partners." Bagley Br. at 54. According to the Bagley Appellants, there "is no proof, anywhere in the record, that a single share of Fortune stock was actually distributed to Princeton Partners in the Fortune transaction." *Id.* at 54-55. Reviewing for clear error, we disagree.

Like the district court, we find the "record is far from clear on this issue." RX.109. But our review for clear error does not leave us with "the definite and firm conviction that a mistake has been committed." *Anderson*, 470 U.S. at 573 (quoting *U.S. Gypsum Co.*, 333 U.S. at 395). The Trustee points to record evidence supporting the bankruptcy court's finding. The first is an email from Mr. Bagley, demonstrating a desire to hold his Fortune stock in Princeton Partners. Supp.RXVII.171. The Trustee also points to transfer sheets indicating Fortune funds moved to (or at least through) Princeton Partners. Supp.RXVIII.37-41. By contrast, the Bagley Appellants have identified no evidence to support their position. Like the district court, we conclude they "have not pointed the Court to any evidence in the record demonstrating either that the Fortune stock was transferred to Bagley alone, or that Princeton Partners never held Bagley's Fortune stock." RX.109. On clear error review, the email and transfer sheets are sufficient, particularly absent any contrary evidence, to support the bankruptcy court's conclusion Princeton Partners received Fortune stock.

38

**E**

Next, the Bagley Appellants argue the bankruptcy court erred in finding "the distribution of the sales proceeds from HLSP-IB to Princeton Partners was a fraudulent transfer by SPIB." Bagley Br. at 59. This holding was erroneous, they contend, because it was based on two factual determinations "that contradict those stipulated to by the parties: (1) that SPIB (rather than Jackson and Princeton Partners) owned HLSP-IB, and (2) that the $1.8 million payout was for cancellation of the PEMG investment advisory contract, rather than the sale of HLSP-IB's interest in PEMG." *Id.* Again, we discern no clear error.

The record confirms the parties stipulated (1) Mr. Jackson and Princeton Partners, not SPIB, owned HLSP IB and (2) HLSP IB sold its interest in PEMG for $1.8 million. RII.158-59. Courts "will not always enforce the terms of a stipulation in the rigid manner that a court typically enforces the terms of a contract," *Lincoln* v. *BNSF Ry. Co.*, 900 F.3d 1166, 1188 (10th Cir. 2018), nor should stipulations "be disregarded or set aside at will," *United States* v. *N. Colo. Water Conservancy Dist.*, 608 F.2d 422, 431 (10th Cir. 1979). Still, we, like the district court, reject the Bagley Appellants contention there was "no basis for finding that SPIB had a sufficient interest in the proceeds of the PEMG sale for them to be SPIB's property for CUFTA purposes." Bagley Br. at 60. Recall, after the

39

Viventures deal, HLSP IB, Hamilton Lane, and SPAS entered into an investment advisory agreement with PEMG. Under this agreement, Mr. Bagley provided consulting services to PEMG and his consulting fees were paid to HLSP IB, which then compensated SPIB. The record shows payments from HLSP IB to SPIB were treated as income on SPIB's financial statements and tax returns. After HLSP IB and PEMG negotiated an early end to this agreement, HLSP IB received a $1.8 million payout. But instead of transferring this $1.8 million to SPIB—as had been the practice before— HLSP IB distributed the funds to Princeton Partners and Mr. Jackson. Under these circumstances, the factual findings of the bankruptcy court on SPIB's entitlement to the Payout proceeds were not clearly erroneous.

## F

Finally, the Bagley Appellants argue the Trustee's fraudulent transfer claim related to the PEMG Payout was time-barred for two reasons. First, they assert any claims relating to the Payout in 2006 expired in the intervening four years before the filing of the petition under the limitations period in Colo. Rev. Stat. § 38-8-110(1)(a). Second, "[e]ven if the Courts below were correct that limitations did not lapse pre-petition," they maintain "the Trustee's PEMG claim is still barred" because he failed to

bring a claim related to the Payout within the two years required by 11 U.S.C. § 546(a). Bagley Br. at 63. We are unpersuaded.

First, we agree with the bankruptcy and district courts that equitable tolling was appropriate for the Trustee's fraudulent transfer claims relating to the PEMG Payout. Appellants correctly point out neither court separately analyzed equitable tolling for the Payout itself. But the bankruptcy court's basis for finding tolling available as to the Fortune transfer under 11 U.S.C. § 544(b) is of equal force here. ART—the actual creditor in whose shoes the Trustee stands—was barred from pursuing fraudulent transfer claims relating to transactions after January 2005. The PEMG Payout occurred in 2006. ART challenged this ruling and pressed its appeal, which remained pending at the time of the bankruptcy filing. As with the Fortune transfer, we impute this diligence to the Trustee and reject any limitations bar on the Trustee's PEMG Payout claims.

Second, we disagree with the Bagley Appellants' contention the Trustee failed to timely bring his claim. While neither the Trustee's complaint nor his amended complaint explicitly named the PEMG Payout as a target transaction, the Payout was discussed in greater detail at the summary judgment stage and at trial—and was included in evidence admitted before the bankruptcy court by stipulation. Our law permits deemed or constructive amendment to conform to evidence presented in

cases where the opposing party would suffer no prejudice. *See New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1231–32 (10th Cir. 2017) (explaining Federal Rule of Civil Procedure 15 and its permission of liberal amendment during and after trial); Fed. R. Bankr. P. 7015 (incorporating Rule 15 in adversary proceedings). Here, we are persuaded the Bagley Appellants had a fair opportunity to defend against the Trustee's claims—indeed, they moved for summary judgment on them—and decline to displace the judgments below on this basis.

## IV

On cross-appeal, the Trustee argues the bankruptcy court erred in rejecting his claims against Mr. Bagley for breach of fiduciary duty and against Mr. Takacs and the Bagley Appellants for alter-ego/veil-piercing relief. He also contends Mr. Takacs and the Bagley Appellants waived their request to cap the bankruptcy judgment.

We review each claim and affirm.[13]

---

[13] Mr. Takacs urges us to dismiss the Trustee's cross-appeal, arguing he "ha[s] no standing" because "he was not aggrieved by the judgment." Takacs Reply Br. at 30. The Trustee counters he *was* aggrieved because he did not "prevail on his alter-ego/veil-piercing claim" and was unsuccessful "on his point regarding the lower court's refusal to hold [Mr.] Takacs had waived a damages cap by not pleading it as an affirmative defense." Trustee Reply Br. at 3. Because we affirm the judgment, we deny Mr. Takacs's motion to dismiss as moot.

## A

The Trustee first contends the bankruptcy court erred in concluding his claim for breach of fiduciary duty was untimely. Specifically, he argues the bankruptcy court "erred in holding adverse domination did not toll limitations." Trustee Br. at 65. We review for an abuse of discretion and find none. *See Barnes* v. *United States*, 776 F.3d 1134, 1148-49 (10th Cir. 2015) ("We review the district court's refusal to apply equitable tolling for an abuse of discretion." (alteration omitted) (quoting *Alexander* v. *Oklahoma*, 382 F.3d 1206, 1215 (10th Cir. 2004))).

Colorado law requires "[a]ll actions for . . . breach of fiduciary duty" shall be "commenced within three years after the cause of action accrues, and not thereafter." Colo. Rev. Stat. § 13-80-101(1)(f). Applying the statute, the bankruptcy court concluded the Trustee's claim for breach of fiduciary duty expired in 2008, three years after Mr. Bagley "breached his duty to refrain from competing with SPIB in the conduct of SPIB's business before SPIB's dissolution"—and two years prepetition. RVIII.53.

On appeal, as before the bankruptcy and district courts, the Trustee relies on the so-called adverse domination theory, "an equitable doctrine that tolls the statute of limitations for claims by a corporation against its officers and directors while the corporation is controlled by those wrongdoing officers or directors." *Gecker* v. *Estate of Kevin Flynn* (*In re*

43

*Emerald Casino, Inc.*), 867 F.3d 743, 760 (7th Cir. 2017) (quoting *Lease Resolution Corp.* v. *Larney*, 719 N.E.2d 165, 170 (Ill. App. 1999)). As applied, the Trustee explains "[a]dverse domination recognizes an entity's controlling wrongdoers"—here, Mr. Bagley—"cannot be expected to sue themselves for fiduciary duty breaches." Trustee Br. at 66.

As a logical matter, the Trustee's argument appears persuasive: a breaching party should not be permitted to "effectively cause [a controlled entity] to waive claims against them." *Id.*

But the Trustee concedes no Colorado court has applied this theory. *See* Trustee Reply Br. at 23. Under these circumstances, we cannot conclude the bankruptcy court abused its discretion by declining to apply an equitable doctrine that no binding authority has adopted. *Cf. United States* v. *Regan*, 627 F.3d 1348, 1354 (10th Cir. 2010) (finding no abuse of discretion in part because proffered cases were not "binding precedent on the district court").

**B**

Second, the Trustee argues the bankruptcy court erred in denying alter-ego/veil-piercing relief. SPIB was "a mere instrumentality," the Trustee explains, and the bankruptcy court's denial of this equitable relief "ignored many of [its own] undisputed fact-findings on CUFTA 'badges of fraud.'" Trustee Br. at 67-68. Like tolling, veil piercing is an equitable

remedy. *Water, Waste & Land, Inc.* v. *Lanham*, 955 P.2d 997, 1004 (Colo. 1998). We review its denial for an abuse of discretion. *Clark* v. *State Farm Mut. Auto. Ins. Co.*, 433 F.3d 703, 709 (10th Cir. 2005) ("We review the [bankruptcy] court's exercise of its equitable powers for abuse of discretion." (citing *Davoll* v. *Webb*, 194 F.3d 1116, 1139-40 (10th Cir. 1999))). This issue presents a close call, but it does not compel reversal.

To pierce the corporate veil, the Trustee needed to show by a preponderance of the evidence, *McCallum Fam. L.L.C.* v. *Winger*, 221 P.3d 69, 72-73 (Colo. App. 2009): (1) SPIB was Messrs. Bagley and Takacs's alter ego; (2) Messrs. Bagley and Takacs used "the corporate fiction" of SPIB "to perpetuate a wrong"; and (3) disregarding SPIB's separate legal status "would achieve an equitable result," *Boxer F2, L.P.* v. *Bronchick*, 722 F. App'x 791, 798 (10th Cir. 2018) (unpublished) (quoting *Griffith* v. *SSC Pueblo Belmont Operating Co.*, 381 P.3d 308, 313 (Colo. 2016)).

For the first prong, the Colorado Supreme Court prescribes a fact-intensive, eight-part analysis to determine "whether such unity of interest exists as to disregard the corporate fiction and treat the corporation and shareholder[s] as alter egos." *Connolly* v. *Englewood Post No. 322 Veterans of Foreign Wars of the U.S., Inc.* (*In re Phillips*), 139 P.3d 639, 644 (Colo. 2006).

> [W]hether (1) the corporation is operated as a distinct business entity, (2) funds and assets are commingled, (3) adequate corporate records are maintained, (4) the nature and form of the entity's ownership and control facilitate misuse by an insider, (5) the business is thinly capitalized, (6) the corporation is used as a "mere shell," (7) shareholders disregard legal formalities, and (8) corporate funds or assets are used for noncorporate purposes.

*Id.* The bankruptcy court applied these factors to the record, and concluded, "[w]hile . . . [Messrs.] Bagley, Takacs, and Jackson participated in a scheme to transfer Debtor's assets to other entities and to themselves, those transfers do not rise to the level of ignoring the corporate existence of each entity." RVIII.56. Accordingly, "[a]lthough it [was] a close call," the bankruptcy court found "the relevant factors insufficient to support a conclusion Debtor was the alter ego of the individual Defendants." *Id.*

We cannot say we share the bankruptcy court's view of all the facts. To frustrate ART's attempts to collect the federal judgment in its favor, SPIB was intentionally stripped of its assets before the Texas state trial. SPIB's records are lacking or, often, absent for extended periods of relevant time. SPIB, Princeton Partners, Mr. Takacs, Mr. Bagley, and others made loans and other transfers using SPIB funds or used SPIB's funds to repay insider loans, with little documentation.

But we are constrained by the record before us and the standard of review. We find ourselves in the same position as the district court: "[W]hile

46

[we] may have concluded to the contrary were [we] presented with this issue in the first instance . . . [we] cannot conclude on appeal that the Bankruptcy Court's factual determinations on this issue were clearly erroneous, or that the Bankruptcy Court's equitable determinations constituted an abuse of discretion." RX.136. We thus affirm the bankruptcy court's denial of relief to the Trustee on the alter-ego/veil-piercing theory.

## C

Finally, the Trustee argues Mr. Takacs and the Bagley Appellants waived their request to cap the bankruptcy court judgment, and that the bankruptcy court erred in concluding otherwise. We disagree.

The Bankruptcy Code provides a trustee "may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property." 11 U.S.C. § 550(a). The Trustee argues this provision functions as a cap on damages and "must be pled as an affirmative defense in federal court. Failure to assert it results in waiver." Trustee Br. at 82-83 (citation omitted). For authority on this point, the Trustee directs us to *Racher* v. *Westlake Nursing Home Limited Partnership*, where we held an Oklahoma law capping noneconomic damages at $350,000 provided an affirmative defense that is waived if not asserted. 871 F.3d 1152, 1166 (10th Cir. 2017).

47

*Racher* is inapposite here. The Oklahoma statute in *Racher* had an *explicit* cap on damages: "[I]n any civil action arising from a claimed bodily injury, the amount of compensation which a trier of fact may award a plaintiff for noneconomic loss shall not exceed Three Hundred Fifty Thousand Dollars." Okla. Stat. tit. 23, § 61.2(B). No analogous cap exists in 11 U.S.C. § 550(a).

Moreover, the Bagley Appellants persuasively argue 11 U.S.C. § 550(a) functions not as a cap, but as a license to sue and recover "for the benefit of the estate." Bagley Reply Br. at 66. In other words, when the estate has already been made whole, recovery for fraudulent transfers is *barred*, not capped. *See Wellman* v. *Wellman*, 933 F.2d 215, 217-18 (4th Cir. 1991) (explaining "§§ 548 and 550 provide for avoidances of transfers and allow recovery of the transferred property or its value only if the recovery is for the benefit of the estate"); *Adelphia Recovery Tr.* v. *Bank of Am., N.A.*, 390 B.R. 80, 95 (S.D.N.Y. 2008) (dismissing fraudulent transfer claims because creditors had already been made whole). We find no error in the bankruptcy court's consideration of Appellants' request for a damage cap.

## V

The judgment of the district court upholding the bankruptcy court's decision is **AFFIRMED**. Mr. Takacs's motion to dismiss the Trustee's

48

cross-appeal is **DISMISSED** as moot. We **DENY** the Trustee's motion to file a supplemental appendix as moot.

ENTERED FOR THE COURT

Veronica S. Rossman
Circuit Judge